788 F.2d 894
 122 L.R.R.M. (BNA) 2201, 104 Lab.Cas. P 11,951
 In The Matter of The Application of WOODCREST NURSING HOME,
Pelham Parkway Nursing Home, New Vanderbilt
Nursing Home and Long Island Nursing
Home, Petitioners-Appellees,
Cross-Appellants,
v.
For a Judgment Staying The Arbitration Commenced by LOCAL
144, HOTEL, HOSPITAL, NURSING HOME AND ALLIED
SERVICES UNION, S.E.I.U., AFL-CIO,
Respondent-Appellant, Cross-Appellee.
 Nos. 827, 1003-05, 1210-13, Docket 86-7064, 86-7080,
86-7082, 86-7084, 86-7088, 86-7090, 86-7092 and 86-7094.
 United States Court of Appeals,
Second Circuit.
 Argued March 24, 1986.
Decided April 17, 1986.
 
 Daniel Engelstein, New York City (Linda E. Rodd, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, of counsel), for respondent-appellant, cross-appellee.
 Elliot B. Pasik, New York City, for petitioners-appellees, cross-appellants.
 Before MANSFIELD, TIMBERS and MESKILL, Circuit Judges.
 PER CURIAM:
 
 
 1
 Local 144 of the Hospital, Nursing Home and Allied Services Union, AFL-CIO ("the Union") appeals the decision of the Southern District of New York, Lloyd F. MacMahon, Judge, denying the Union's motions to compel the Woodcrest, Pelham Parkway, New Vanderbilt and Long Island Nursing Homes ("the Nursing Homes") to arbitrate disputes involving specified employees and to dismiss the Nursing Homes' petitions to stay the same arbitrations. The Nursing Homes cross-appeal the district court's denial of their motion for the imposition of sanctions against the Union pursuant to Fed.R.Civ.P. 11.[1] The district court found that the Union was seeking to compel arbitration of disputes which, under the Union's Collective Bargaining Agreement with the Nursing Homes, were not subject to arbitration, but that the Union's conduct was not so egregious as to warrant Rule 11 sanctions. We affirm.
 
 
 2
 The Union represents the Nursing Homes' non-supervisory employees. On April 1, 1981 the Union entered into a Collective Bargaining Agreement with the Nursing Homes, Par. 8.A. of which provided for arbitration as follows:
 
 
 3
 "All complaints, disputes, controversies or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this agreement, or any acts, conduct or relations between any of the parties hereto and/or between the Union and any Employer, directly or indirectly, which shall not have been adjusted by and between those involved shall be submitted to the Impartial Chairman hereinafter mentioned for arbitration and his decision shall be final and binding upon the parties hereto."
 
 
 4
 The Agreement ran through March, 1984. In June 1984, the parties entered into a second Collective Bargaining Agreement which "extended and renewed [the 1981 Collective Bargaining Agreement] for a two (2) year period commencing April 1, 1984 and continuing up to and including March 31, 1986, with all of the terms and conditions therein contained except as modified [herein]". One of the changes the second Agreement worked in the original contract was to clarify the rights of a class of workers whom the 1981 Agreement had termed "casual" and the second Agreement labelled "non-slotted/replacement" employees. In the words of the second Agreement, "[s]lotted/regular employees are those who fill the employment slots.... Non-slotted/replacement employees are those persons who only substitute for slotted/regular employees during their absence on non-working benefit days (leave, holidays, personal days or vacation)."Par. 2C(8) of the Second Agreement provided:
 
 
 5
 "Non-slotted/replacement employees shall not be subject to the terms and benefits of this agreement [with three exceptions]."
 
 
 6
 None of the exceptions concerned arbitration: the first established that the non-slotted employees were subject to the 1981 Agreement's requirement that the Nursing Homes employ "in the bargaining unit only members of the Union in good standing"; the second stated that, in certain circumstances, the Nursing Homes were required to make contributions to the Union Pension Fund on behalf of non-slotted employees; and the third stated that the non-slotted employees were eligible for welfare coverage and that the Nursing Homes should, in certain circumstances, contribute to the "Welfare Fund" on their behalf.
 
 
 7
 Between September 1984 and May 1985 the Union requested arbitration of (1) Woodcrest's "unjust reduction" in Danny and Tony Castro's work schedule, (2) Long Island's underpayment of Bernadine Karupen, (3) Pelham's underpayment of Heather Mack, (4) Pelham's "unjust reduction" in Norma Castro's wages and benefits, and (5) New Vanderbilt's "unjust discharge" of Dorrand Mitchell. In each case the Nursing Home requested that the arbitration hearing be delayed and then, shortly before the rescheduled hearing date, obtained an ex parte order from the New York State Supreme Court staying the arbitration. In each case, the Nursing Homes submitted affidavits from their Administrators stating that the employees were "non-slotted" and requested stays on the grounds that Par. C(8) of the second Collective Bargaining Agreement precluded arbitration of disputes involving "non-slotted" employees.
 
 
 8
 The Union removed the cases to the Southern District of New York and filed a motion (1) to dismiss the Nursing Homes' petitions to stay the arbitration, (2) to compel arbitration, and (3) to enjoin the Nursing Homes from ever again litigating the issue of arbitrability of the grievances of non-slotted employees. The Union also requested that Rule 11 sanctions be imposed against the Nursing Homes for initiating "frivolous litigation." The Nursing Homes replied by moving for a permanent stay of arbitration and requesting that Rule 11 sanctions be imposed against the Union.
 
 
 9
 The district court denied the Union's motion and granted the Nursing Homes' request for an order permanently staying the arbitrations. However, it denied the Nursing Homes' request that the Union be sanctioned under Rule 11. The Union and the Nursing Homes appeal from the denial of their respective motions.
 
 DISCUSSION
 
 10
 The principles governing whether a dispute must be arbitrated are well settled. A party is not required to submit a dispute to arbitration unless it has contracted to do so. AT&T Technologies, Inc. v. Communications Workers of America, --- U.S. ----, ----, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); Nolde Bros., Inc. v. Bakery Workers, 430 U.S. 243, 250-51, 97 S.Ct. 1067, 1071-72, 51 L.Ed.2d 300 (1977); Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 374, 94 S.Ct. 629, 635, 38 L.Ed.2d 583 (1974); Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Since interpretation of the terms of a contract normally raises a question of law, Heyman v. Commerce and Industry Insurance Co., 524 F.2d 1317, 1320 (2d Cir.1975); Painton & Co. v. Bourns, Inc., 442 F.2d 216, 233 (2d Cir.1971), the issue of whether the agreement could be construed as providing for arbitration of a dispute must in the first instance be decided by the court rather than by the arbitrators. AT&T Technologies, supra, --- U.S. at ----, 106 S.Ct. at 1418; Operating Engineers v. Flair Builders, Inc., 406 U.S. 487, 491, 92 S.Ct. 1710, 1712, 32 L.Ed.2d 248 (1972); Warrior & Gulf Navigation Co., supra, 363 U.S. at 582, 80 S.Ct. at 1352.
 
 
 11
 In deciding whether an agreement potentially provides for arbitration of a specific dispute the terms of the agreement, in recognition of the strong federal policy favoring arbitration of labor disputes, Nolde Bros., supra, 430 U.S. at 254-55, 97 S.Ct. at 1073-74; International Union of Elevator Constructors v. National Elev. Industry Inc., 772 F.2d 10, 13 (2d Cir.1985), must be construed by the court broadly, with all doubts resolved in favor of consigning the dispute (even if it concerns the arbitrability of an issue) to the arbitrators for decision. AT&T Technologies, supra, --- U.S. at ----, 106 S.Ct. at 1418; Rochdale Village, Inc. v. Public Service Emp. Union, 605 F.2d 1290, 1295 (2d Cir.1979). However, when "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" the court is not required to go through the useless procedure of ordering arbitration. Warrior & Gulf Navigation, supra, 363 U.S. at 582-83, 80 S.Ct. at 1352-53; see also Rochdale, supra, 605 F.2d at 1295; Gangemi v. General Electric Co., 532 F.2d 861, 865 (2d Cir.1976). In such a case arbitration would serve no purpose since the arbitrators would be obligated to decide against arbitrability of the dispute or face the prospect that if they should erroneously decide otherwise their award would later be vacated by the court.
 
 
 12
 In determining whether a given dispute must be arbitrated the court looks to all terms of the parties' agreement bearing on arbitration. Even though the words of the agreement's arbitration clause may be broad, its scope may be limited by language elsewhere in the agreement clearly and unambiguously negating or limiting it with respect to a matter in dispute. Nolde Bros., supra, 430 U.S. at 255, 97 S.Ct. at 1074. See also International Union of Elevator Constructors, supra, 772 F.2d at 13; McAllister Bros., Inc. v. A & S Transp. Co., 621 F.2d 519, 522 (2d Cir.1980); Gangemi v. General Electric Co., 532 F.2d 861, 865 (2d Cir.1976). The court must therefore "make a threshold inquiry into whether the contract's arbitration provisions arguably cover the dispute at hand" and "if the arbitration agreement cannot reasonably be construed to cover [the dispute at hand] arbitration need not be compelled." McAllister Bros., supra, 621 F.2d at 522.
 
 
 13
 In the present case the arbitration clause of the parties' 1981 agreement is indeed broadly worded and standing alone would call for arbitration of the parties' present disputes. However, the exclusionary clause of Par. C(8) of the parties' 1984 second Collective Bargaining Agreement is crystal clear and unambiguous regarding disputes raised by "non-slotted" employees other than those with respect to three specifically enumerated exceptions. It unequivocally provides that "[n]on-slotted/replacement employees shall not be subject to the terms and benefits of this agreement" except for the enumerated matters, which are irrelevant to the disputes raised in this case.
 
 
 14
 As stated in Communications Workers of America v. New York Telephone Co., 327 F.2d 94, 97 (2d Cir.1964), "... we cannot close our eyes to the plain meaning of the words used." Since Par. C(8) clearly excludes non-slotted employees from discharge and layoff rights, which are "terms and benefits" of the agreement available only to slotted employees, it also unambiguously excludes arbitration of disputes with respect to such rights on the part of non-slotted employees. Nor can the applicability of the exclusionary clause be circumvented by labelling it "substantive." Arbitration remains one of "the terms and benefits" of the agreement, to which non-slotted employees "shall not be subject." No such exclusionary clause is to be found in the cases relied on by the Union, including our decisions in Ottley v. Sheepshead Nursing Home, 688 F.2d 883 (2d Cir.1982), and Rochdale Village, Inc., supra.
 
 
 15
 For the first time on this appeal the Union, seeking to avoid the exclusionary terms of Par. C(8), attempts to raise a factual dispute as to whether the disputes it seeks to arbitrate involve slotted or non-slotted employees. The record, however, reveals no such issue. In support of their motions to stay arbitration, each of the Nursing Homes submitted an affidavit of its owner or chief administrator, who has personal knowledge of the duties and status of the Nursing Homes' employees, to the effect that the employees demanding arbitration are "non-slotted." Aside from a pro forma denial in its answer of the allegations of the Nursing Homes' complaints the Union did not rebut the sworn statements of the nursing home owners and administrators or furnish any contrary evidence by affidavits or allegations of specific facts indicating that employees demanding arbitration might be slotted rather than non-slotted.
 
 
 16
 On this record it cannot fairly be said that the Union raised in the district court a genuine factual issue regarding the status of the employees seeking arbitration. The Union apparently was content to rely entirely on the reach of the agreement's arbitration clause rather than on the status of the employees demanding arbitration. Having waited until this appeal to raise the question, it is foreclosed at this stage from doing so for the first time. See Singleton v. Wulff, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); List v. Fashion Park, Inc., 340 F.2d 457, 461 (2d Cir.), cert. denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60, rehearing denied, 382 U.S. 933, 86 S.Ct. 305, 15 L.Ed.2d 344 (1965); Terkildsen v. Waters, 481 F.2d 201, 204-05 (2d Cir.1973). Otherwise, the Nursing Homes would be deprived of the opportunity to introduce further evidence on the subject. Moreover, the Union's conclusory denial is insufficient to raise an issue of fact in view of the Nursing Homes' affidavits. See, e.g., Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983); S.E.C. v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978).
 
 
 17
 The Union's further argument that the Nursing Homes waived their right to seek a stay of arbitration by participating in the arbitrations must also be rejected. In the first place, their participation was minimal, amounting for the most part to efforts to postpone and delay arbitration. Although a Union affidavit states that hearings were conducted in connection with the New Vanderbilt arbitrations, the nature of the hearings and whether they also related only to postponements is not revealed. In any event, although waiver of the right to challenge arbitration may be more readily found under New York state law, In re Boston Old Colony Insurance Co. v. Martin, 34 A.D.2d 776, 310 N.Y.S.2d 820 (1st Dept.1970); Hodges International Inc. v. Rembrandt Fabrics Ltd., 44 A.D.2d 77, 353 N.Y.S.2d 462, 463 (1st Dept.1974), federal courts, applying federal law, would not be justified in finding a waiver on the facts of this case. See Local 719, American Bakery & C. Wkrs. v. National Biscuit Co., 378 F.2d 918, 921-22 (3d Cir.1967); Humble Oil and Refining Co. v. Local Union 866, 271 F.Supp. 281, 284 (S.D.N.Y.1967).
 
 
 18
 Turning to the Nursing Homes' cross-appeal, we find no merit in their contention that the district court abused its discretion in denying their motion for imposition of Rule 11 sanctions. The district court's discretion is broad. 2A J. Moore & J. Lucas, Moore's Federal Practice, p 11.02 (1985). The Nursing Homes' litigation tactics, which apparently provoked the Union's motion for imposition of Rule 11 sanctions and its filing of unfair labor practice, hardly represented a model of propriety. Instead of promptly raising the issue of arbitrability of the disputes, the Homes first engaged in conduct designed to delay the proceedings indefinitely, including repeated applications for postponement of arbitration and, despite the Union's request to be advised of applications to the court, obtained ex parte orders staying arbitration.
 
 
 19
 The order of the district court is affirmed.
 
 
 
 [1]
 "Rule 11. Signing of Pleadings, Motions, and Other Papers; Sanctions
 "... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee."